**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| RANDSTAD TECHNOLOGIES, LLC | ) | |
| | ) | CIVIL ACTION FILE NO: |
| Plaintiff, | ) | 1:20-cv-04105-SCJ |
| v. | ) | |
| | ) | (Removed from the Superior |
| LISETTE ROBLES, | ) | Court of Cobb County) |
| | ) | |
| Defendant. | ) | |
| ______________________________________ | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendant files this Response in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order (the "Motion"), and showing this Court as follows:

## I. INTRODUCTION

Plaintiff's entire lawsuit is based on the false premise that Ms. Robles resigned and stole "Client A." However, Ms. Robles has not done so. Ms. Robles did not even notify Client A of her resignation—Plaintiff did. She also did not take or ever attempt to take Client A's work to her new employer. Ms. Robles has no interest in working with Client A and has no intention of doing so.[1]

[1] Client A is one of the top 10 largest companies in the United States, uses numerous staffing companies, and is well known to the public and the staffing industry, so its existence is not confidential or a secret. Nevertheless, since Plaintiff referred to the client with this pseudonym, we will play along with their charade.

Based on an entirely false premise, Plaintiff asks the Court to enjoin Ms. Robles, not only from working with Client A, but from working in the staffing business in virtually the entire metropolitan Phoenix market despite the fact that all of her placements with Plaintiff were with Client A and a handful of other clients. Plaintiff has no legitimate business interest in preventing Ms. Robles from working in the staffing industry in Phoenix as long as she is not soliciting or servicing the clients she worked with at Plaintiff (which she is not).

The staffing industry is the primary industry Ms. Robles has worked in since graduating from college 11 years ago. Ms. Robles is a single mother in her 30's, caring for her 11-year old son, Nicholas, who just recently had surgery. She lives in a home with Nicholas, her parents, and her pregnant sister. Ms. Robles pays the mortgage for the home and also pays for the major household expenses including groceries and household maintenance expenses. If Ms. Robles is barred from working in the staffing industry in Phoenix, her family risks losing healthcare, health insurance, and their home. O.C.G.A. section 13-8-58(d) expressly permits consideration of the economic hardship that an injunction would impose on Ms. Robles in determining the reasonableness of the noncompete. If this is not a situation in which this code section applies, it is difficult to conceive of a situation in which it does. For these reasons and as more fully explained below, the Motion should be

denied.

## II. STATEMENT OF FACTS

### A. **Ms. Robles' experience in the staffing industry.**

Ms. Robles started her career in the staffing industry in 2009 after graduating from college. [Declaration of Lisette Robles ("Robles Dec."), ¶ 14].[2] She worked for various staffing companies, and in 2016 she joined Kforce, a staffing agency, in its Phoenix, Arizona office. [*Id.*, at ¶ 17]. At Kforce, Ms. Robles was promoted to Strategic Account Management for their Premier Partners division, where she managed a specific client, Wells Fargo. [*Id.*, at ¶ 18]. She learned the ins and outs of the staffing industry through these other jobs. [*Id.*, at ¶ 14].

### B. **Ms. Robles' employment at Plaintiff.**

Ms. Robles started her employment with Plaintiff in January 2018 as an Account Manager. [*Id.*, at ¶ 20]. In connection with her employment at Plaintiff, on January 9, 2018, she was required to sign an Employee Non-Competition and Confidentiality Agreement (the "Agreement"). [*Id.*, at ¶ 21]. The only office that Ms. Robles was assigned to or performed work at was Plaintiff's Phoenix, Arizona branch located at 3800 N. Central Ave suite c-100, Phoenix, AZ 85012. [*Id.*, at ¶ 22].

---

[2] The Robles Dec. is attached hereto as Exhibit "A".

## C. Ms. Robles' work with Client A.

Since the latter part of last year, the primary client Ms. Robles worked with at Plaintiff is referred to as "Client A" by Plaintiff. [*Id.*, at ¶ 24]. Client A is one of the largest companies in the United States. At least 80% of the work she performed for Plaintiff in her last year at Plaintiff was work for Client A. [*Id.*, at ¶ 24]. She worked primarily on a staffing project in San Francisco for Client A related to the IT aspects of an oncology project. [*Id.*, at ¶ 24]. Ms. Robles was Client A's primary contact for its Arizona and San Francisco locations. [*Id.*, at ¶ 25]. While Client A had decided to pull its work from Plaintiff for another staffing firm as a result of issues with another of Plaintiff's Account Managers, Client A agreed to give Plaintiff another opportunity on the project if Ms. Robles was the primary point of contact for the initiative. [*Id.*]. As a result, in 2020, Ms. Robles placed approximately 11 full time employees in San Francisco for Client A's oncology project, and one employee in Phoenix and one in Houston, Texas. [*Id.*].

## D. Ms. Robles resigns from Plaintiff.

On September 8, 2020, Ms. Robles resigned from Plaintiff as she was entitled to do as an at-will employee. [*Id.*, at ¶ 26]. Ms. Robles resigned from Plaintiff because of a lack of career opportunity, poor company culture, and a lack of professional respect and support from her leadership team. [*Id.*].

**E. <u>Ms. Robles joins Beacon Hill.</u>**

On September 14, 2020, Ms. Robles began her employment with Beacon Hill Staffing Group, LLC ("Beacon Hill") as an Account Executive. [*Id.*, at ¶ 27]. Since joining Beacon Hill, all of her work relates to a single prospective client, "Client X." She did not work with Client X during her employment with Plaintiff. [*Id.*] While Client X is located in Arizona, it is located more than 25 miles from the office of Plaintiff at which she worked [*Id.*]. Client X is in an entirely different industry than Client A and the other few companies Ms. Robles made placements at on behalf of Plaintiff. [*Id.*, at ¶ 28].

## III. <u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Forsyth Cty. v. U.S. Army Corps of Engineers,* 633 F.3d 1032, 1039 (11th Cir. 2011) (citing *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)); *see also State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and plaintiff must clearly carry the burden of persuasion). To be eligible for a temporary restraining order or preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, a movant

must establish each of the following elements: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the plaintiff unless the injunction issues; (3) the threatened injury to the plaintiff outweighs the harm to the defendant if the injunction issues; and (4) the injunction will not disserve the public interest. *Id.* (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)). Here, Plaintiff cannot establish any of the elements required for injunctive relief.

**A. <u>The threatened injury to Ms. Robles if the Court issues an injunction outweighs the alleged threatened harm to Plaintiff.</u>**

In deciding whether to preserve the status quo and issue an injunction, a trial court must balance the conveniences of the parties and determine "whether the threatened harm to the plaintiff outweighs the threatened harm to the defendants." *Ga. Gazette Publ'g Co. v. U.S. Dep't of Defense,* 562 F. Supp. 1004, 1010 (S.D. Ga. 1983) (citing *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 435 (5th Cir. 1981)). Additionally, before issuing an injunction, the trial court must balance the relative equities of the parties and must determine that the party seeking injunctive relief has met its burden to obtain an injunction. *See Wesley-Jessen, Inc v. Armento*, 519 F. Supp. 1352, 1355 (N.D. Ga. 1981).

On the one hand, Plaintiff is the largest staffing company in the world, with

$26 billion in revenue.[3] Plaintiff also is not at risk of losing *any* existing business as a result of any conduct on the part of Ms. Robles.[4] On the other hand, if the Court issues the injunction that Plaintiff seeks, Ms. Robles will be entirely precluded from working in the staffing business in almost the entire metropolitan Phoenix area. Setting aside the fact that Plaintiff has no legitimate business interest justifying such an onerous noncompete, enforcing the noncompete would result in in a devastating economic hardship for Ms. Robles and her family.

Ms. Robles has the right to earn a livelihood in her chosen field. *See W.R. Grace & Co., Dearborn Division v. Mouyal*, 262 Ga. 464, 466, 422 S.E.2d, 529, 531 (acknowledging an employee's right to earn a living). The staffing industry is the primary industry Ms. Robles has worked in since graduating from college 11 years ago. [Robles Dec., ¶ 14] Ms. Robles is a single mother in her 30's, caring for her 11-year old son, Nicholas, who just recently had a liver biopsy due to an unresolved gastrointestinal issue. [*Id.*, at ¶ 4] She lives in a home with Nicholas, her parents, and her pregnant sister. The home is owned by her parents, but Ms. Robles pays their mortgage. She also pays for the major household expenses including groceries and

---

[3] *See* https://www2.staffingindustry.com/row/Editorial/Daily-News/World-Randstad-and-The-Adecco-Group-rank-first-and-second-on-SIA-s-2019-Largest-Global-Staffing-Firms-list-52039.

[4] In its Motion to Remand, Plaintiff claims that the value of the injunctive relief it seeks in this case does not even exceed $75,000.

household maintenance expenses. If Ms. Robles is unable to work, her family risks losing healthcare and their home. Additionally, the health insurance she receives through her employment with Beacon Hill is critical in order to provide the medical attention her son needs. [*Id.*, at ¶ 5] Ms. Robles earns approximately $100,000 to $150,000 annually and has about $30,000 in total savings. [*Id.*, at ¶ 11]

In addition, if Ms. Robles is enjoined from working in the staffing business in the Phoenix area, she cannot simply move to another city or region. Under the custody agreement with Nicholas' father, she is not permitted to move more than 100 miles away from her current residence or to relocate out of the state of Arizona.[5] The next nearest metro area where she could even conceivably find comparable work is in Tucson, Arizona, more than 100 miles away. Moreover, under the custody agreement, Nicholas spends two weekdays per week with his father and Ms. Robles is required to personally pick him up. Ms. Robles thus cannot simply move out of the Phoenix area to continue in the staffing industry, and thus the requested injunction would devastate her family life and effectively put Ms. Robles out of work during a global pandemic.

O.C.G.A. section 13-8-58(d) of Georgia's Restrictive Covenant Act (the

[5] This provision of the custody agreement was added at the request of her son's father in 2019, after she had already signed the Agreement with Randstad.

"Act"), expressly permits the Court to consider the economic hardship that an injunction would impose on Ms. Robles in determining the reasonableness of the noncompete. Under these circumstances, if this is not a situation in which this section of the Act applies, it is difficult to conceive of a situation in which it would. As such, the threatened injury to Ms. Robles, particularly given the economic hardship that would be caused by the requested injunction, far outweighs any alleged threatened harm to Plaintiff, so the Motion should be denied.

## B. Plaintiff is not likely to succeed on the merits of its claims.

### 1. Ms. Robles did not breach the nonsolicit.

The Motion is based on the entirely false premise that Ms. Robles improperly solicited Client A and that "on information and belief, Robles is now servicing Client A at Beacon Hill . . ." [TRO Brief, p. 9]. Plaintiff bases this allegation on the sole fact that Client A stopped responding to Plaintiff after Ms. Robles left. However, Ms. Robles did not even tell Client A she was leaving Plaintiff's employment, much less solicit its business. [Robles Dec., ¶ 33]. Moreover, Ms. Robles is not doing business with Client A and has no intention of doing so. [*Id.*]. The only communications Ms. Robles has had with Client A is when the client called her after Plaintiff informed the client that she had left its employ and Ms. Robles informed Client A that she was going to work for Beacon Hill and that she would not be working with Client A. [*Id.*]. Ms. Robles also has not solicited or done any business

with any other clients with whom she dealt at Plaintiff and has no intention of doing so. [*Id.*]. Since starting at Beacon Hill, Mr. Robles has only worked on one client, Client X, whom she did not service as a client while at Plaintiff. [*Id.*, at ¶ 27].

Plaintiff claims it has reason to believe Ms. Robles told Client A she was leaving to join Beacon Hill based on an e-mail she sent to her contact at Client A on September 4, 2020 in which she said "Disregard. I'll bug you on Tuesday. :)". [TRO Brief, p. 8]. Plaintiff is mistaken. In her role at Plaintiff, Ms. Robles e-mailed, texted, and spoke with her contact several times per day. [Robles Dec., ¶ 33]. On September 4, the Friday before Labor Day, she traded e-mails with him and had sent an e-mail regarding various issues they needed to discuss. [*Id.*]. Separately, in a phone call with him, he stated that it was the Friday before a long weekend and that everything could wait until the following week. [*Id.*]. Based on the call, Ms. Robles sent the e-mail, telling him that she would wait until Tuesday to "bug" him about the various issues they needed to discuss. [*Id.*]. The e-mail was nothing more than a regular e-mail, sent in the course of Ms. Robles work on behalf of Plaintiff.

Plaintiff's affidavits in support of its claim that Ms. Robles solicited Client A are based entirely on hearsay and speculation. Ms. Robles declaration, unequivocally denying any solicitation of Client A or any other client of Plaintiff, is the only direct evidence and, absent *any* credible or admissible evidence to the contrary, establishes

that she did not solicit or attempt to solicit Client A. Ms. Robles did not breach the nonsolicit, and thus Plaintiff is unlikely to succeed on the merits of that claim.[6]

**2. The noncompete is invalid and unenforceable because Plaintiff does not have a legitimate business interest in prohibiting Ms. Robles from competing.**

Plaintiff has not "prove[n] the existence of one or more legitimate business interests justifying" the noncompete as required by O.C.G.A. section 13-8-55. In support of the Motion, Plaintiff vaguely references "customer goodwill, substantial relationships with specific customers, and trade secrets and Confidential Information *regarding the accounts over which she had responsibility*." [TRO Brief, p. 13 (emphasis added)]. None of these alleged business interests is threatened by Ms. Robles working for Beacon Hill given that she is not soliciting or servicing the customers she dealt with at Plaintiff. Plaintiff's vague assertion of protectable interest is insufficient to prove the existence of a legitimate business interest.

In addition, the 25-mile radius in the Agreement is completely arbitrary. If Ms. Robles' house is within 25-miles of Plaintiff's Phoenix office, what possible interest does Plaintiff have in preventing her from working from home with companies she never worked with at Plaintiff whether they are located inside or

[6] Ms. Robles does not concede the enforceability of the nonsolicit; however, no injunction enforcing the nonsolicit is necessary because Mr. Robles has not violated it and has no intention of violating it.

outside the 25 miles? Plaintiff has not established any such interest.

*a. The alleged confidential information Plaintiff seeks to protect does not give Plaintiff a legitimate business interest.*

When viewed within the unique context of the staffing industry, the noncompete does not protect any legitimate business interest of Plaintiff. In the staffing industry, identities of clients, hiring managers, and candidates, the existence of job openings, and contact information for the players in the industry all are publicly available. [Robles Dec. ¶ 41].

In a similar case involving a staffing firm seeking to enforce post-employment covenants against a former employee who joined Beacon Hill, a district court in Missouri denied the preliminary injunction, describing the situation as follows:

> [Employee] and Beacon Hill have presented evidence that the information [employee] allegedly misappropriated is not protectable because it is widely available to the public, known by account managers generally in the staffing agency business, and easily ascertainable by other sources. [Employee] testified that the names of hiring managers are generally available to the public, either through websites or by calling companies. ... [T]he names of hiring managers, company structure, and hiring needs[] is readily available publicly and through a subscription website used by staffing agencies, including Beacon Hill.

*Kforce Inc. v. Beacon Hill Staffing Grp. LLC,* No. 4:14 CV 1880 CDP, 2015 WL 128060, at *9 (E.D. Mo. Jan. 8, 2015).

Similarly, here, Plaintiff's purported confidential information is not a legitimate business interest warranting a blanket noncompete. In fact, Plaintiff says

the customer goodwill, relationships with specific customers, and trade secrets and Confidential Information "regarding the accounts over which she had responsibility" is the interest it seeks to protect. At Beacon Hill, Ms. Robles has not solicited, does not intend to solicit, is not working with and has no intention of working with any accounts over which she had responsibility at Plaintiff. Therefore, the noncompete over-protects the business interest Plaintiff purports to be concerned about.

In addition, prior to joining Plaintiff, Ms. Robles worked at Kforce, another staffing firm, for approximately two years. [Robles Dec., ¶ 17]. She also previously worked for a staffing firm for five years out of college. [*Id.*, at ¶ 15]. She worked for Plaintiff for just over two years. [*Id.*, at ¶ 20]. There is nothing unique, special, or different at Plaintiff as a staffing company. [*Id.*, at ¶ 42]. Ms. Robles did not learn anything at Plaintiff that is unique, special or different that will give her or Beacon Hill an unfair advantage in the Phoenix market or otherwise. [*Id.*].

Moreover, Ms. Robles did not take any confidential information from Plaintiff, and Plaintiff does not even allege she did. [*Id.* at ¶ 40]. She is not using and has no interest in the purported confidential information identified in the Motion. [*Id.*]. Client A is one of the ten largest companies in the world. [*Id.*, at ¶40]. There is nothing secret or confidential about the fact that Client A hires thousands of temporary and permanent employees every year or that it uses numerous staffing

firms like Plaintiff and others to do so. [*Id.*]. In fact, Client A has its own website in which it promotes job opportunities throughout the world, including the Phoenix market. [Fn 1 of Robles' Dec]. Client A uses numerous staffing companies that are "generally known to the public or Randstad's competitors," which is a specific carve out from the Agreement's definition of "Confidential Information." [*See* Agreement, § 2(b)(iv)]. The identity of customers also is not enumerated in the Employment Agreement as confidential. Plaintiff's vague generalizations about confidential information are insufficient to prove a legitimate business interest.[7]

The noncompete also impermissibly prohibits competition with Plaintiff by "engaging in responsibilities in which [she] would utilize or disclose Confidential Information." [Agreement, § 4(d)(iv)]. In *Medical Doctor Assoc's, LLC v. Karesh*, this Court previously considered a similar provision in a noncompete and held that where there is no evidence that the employee had knowledge of, or use for, the "Confidential Information," it was "unreasonable for Plaintiff to restrict her from

---

[7] Plaintiff's half-hearted argument that the court should enjoin Ms. Robles based on a threatened misappropriation of trade secrets is without merit. Setting aside that Plaintiff has not asserted a claim for a misappropriation of trade secrets or produced any evidence that she used or disclosed any trade secrets, Georgia courts do not recognize the inevitable disclosure doctrine as a stand-alone cause of action. *See Holton v. Physician Oncology Services, LP*, 292 Ga. 864, 742 S.E.2d 702 (2013) ("[T]he inevitable disclosure doctrine is not a[n] independent claim under which a trial court may enjoin an employee from working for an employer ….").

taking any position where she 'might' use information covered by that term."[8] The noncompete in Ms. Robles Agreement suffers from the same overbreadth.

*b. Plaintiff's client relationships do not give Plaintiff a legitimate business interest.*

Plaintiff's contention that its client relationships are a legitimate, protectable interest is belied by the competitive realities of the staffing industry. In the staffing business, unlike many other contexts in which courts are called upon to enforce noncompetes, client relationships are not exclusive and clients work with several staffing companies at the same time on the same project or placements. [Robles Dec., ¶ 41]. Staffing clients and candidates alike simply do not tie themselves to a particular placement agency, as both are trying to find the most suitable match from the broadest market, no matter who makes the placement. [*Id.*].

Plaintiff's business is far from unique. Other staffing companies, including Beacon Hill and Ms. Robles' previous employer, Kforce, provide the same services to the same clients at the same time. [Robles Dec., ¶ 41]. Other courts addressing this issue in the staffing industry have recognized this reality. Those courts have refused to enforce covenants except where the plaintiff employer can identity a

[8] The Order Granting in part and denying in part the plaintiff's motion for temporary restraining order in the matter of *Medical Doctor Assoc's, LLC v. Karesh*, No. 1:18-CV-3576-SCJ (N.D. Ga. August 7, 2018), is attached hereto as Exhibit "B".

discrete business interest particular to the defendant former employee that can be lawfully protected by contract. *See, e.g., Kforce Inc.*, 2015 WL 128060, at *9 (recognizing that "it is not the account manager's relationship with the client's hiring managers, but the staffing agency's ability to successfully deliver candidates, which leads to increased placements").[9]

As is true throughout the staffing industry, Plaintiff's "clients" are also clients of other staffing agencies. It is an artifice to protect Plaintiff's purported client relationships to the exclusion of the other agencies. Nevertheless, Ms. Robles is not doing business with and has no intention of attempting to do business with any customers she worked with during her employment with Plaintiff. To the extent Plaintiff has any legitimate business interest to protect, this is more than sufficient.

Plaintiff provides no factual basis to support its conclusory claims that the noncompete protects a legitimate business interest. As such, it cannot be enforced.

*c. Plaintiff's selective enforcement of its restrictive covenants demonstrates that its alleged legitimate business interests are not actually in need of protection.*

Waiver of a contractual right occurs where there is "an intentional

[9] *See also*, *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1012 (N.D. Ill. 2014), *aff'd*, 793 F.3d 748 (7th Cir. 2015) (collecting cases refusing to enforce restrictive covenants in the staffing industry since the business is highly competitive and commoditized, and employees have non-exclusive relationships with clients).

relinquishment of a known right" by a party's act or omission. *Wallace v. Wallace*, 813 S.E.2d 428, 435 (Ga. Ct. App. 2018) (citing *Forsyth Cty. v. Waterscape Servs., LLC*, 694 S.E.2d 102 (Ga. Ct. App. 2010)). Where an employer has permitted prior employees—particularly key personnel—to accept employment with a competitor without attempting to enforce that employee's restrictive covenants, courts often find the employer has waived its right to enforce similar covenants against a later-departing employee. *See Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 686 (D. Minn. 1986) (refusing to enforce noncompetes against four former officers where 28 other employees had been permitted to move to competitors over the years and the employer had similarly engaged in hiring employees from competitors). An employer that inconsistently enforces its restrictive covenants may have waived its rights because "it would be inequitable to permit plaintiff to . . . rely on a [restrictive covenant] which it has so blithely ignored in the past." *Id.* at 698.

If there is any evidence that a former employer has narrowed or in any way limited its restrictive covenants for other departing employees, the former employer has likely waived or at least limited its rights under its agreements. *See Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 181 (S.D.N.Y. 2006) (finding that a12 month post-termination restriction of a high level executive was unnecessary as other executives' agreements had been narrowed from six months to three to five months);

*Gateway 2000, Inc. v. Kelley*, 9 F. Supp. 2d 795 (E.D. Mich. 1998) (finding agreement containing general restriction on working for competitors was overly broad where newer agreement only listed restrictions for specific competitors); *Gagliardi Bros., Inc. v. Caputo*, 538 F. Supp. 525 (E.D. Pa. 1982) (finding one year noncompete was likely not necessary where former employer had not required employees to sign employment agreements in the last five years).

Plaintiff has declined to enforce restrictive covenants against other former employees, in the same market. [*See* Decl. of Louis Wiedman ("Wiedman Dec.")[10], ¶¶ 3-6; Robles Dec., ¶¶ 43-47]. Moreover, Plaintiff's Human Resources department is informing its departing employees that they can take new jobs in the staffing industry as long as they do not violate the customer non-solicitation and employee non-recruitment covenants in their agreements. [Wiedman Dec, ¶ 6]. Similarly, when Ms. Robles resigned from Kforce and joined Plaintiff, she was informed by Plaintiff that, despite her post-employment restrictions with Kforce, she could target the Phoenix market as long as she did not solicit or do any staffing work for her main client at Kforce or take any clients from Kforce. [Robles Dec., ¶ 43]. Plaintiff has waived its right to enforce the restrictive covenants as a result of its selective enforcement, and thus has failed to prove that it has a legitimate business interest in

[10] The Wiedman Dec. is attached hereto as Exhibit "C".

enforcing the covenants. If Plaintiff was actually concerned about its supposedly super-secret information, it would not allow others to leave and join competitors without taking legal action. Its failure to do so demonstrates that the information it claims here that it needs to protect is not actually confidential or a trade secret.

### 3. The noncompete is unenforceable as ambiguous.

#### *a. The noncompete is indecipherable.*

The noncompete also should not be enforced because it is impossible for any lay person, or even a lawyer well versed in noncompete law, to determine what is and is not prohibited. The party that Ms. Robles entered the agreement with is "Randstad, a Delaware limited liability company." No such company exists. The Plaintiff in this suit is Randstad Technologies, LLC.[11] Therefore, Plaintiff has not even established that it is a party to the Agreement it seeks to enforce or even that it is an intended third-party beneficiary of the Agreement.

In addition, the critical "Business of the Company" definition in Section 2(a) is ambiguous. It reads as follows:

> 'Business of the Company' means the services provided by Randstad, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing services, payrolling, recruitment process outsourcing, independent contractor assessment and placement, HR and management consulting, managed services, solutions services,

[11] Randstad LLC does not have legal existence. *See* Certificate regarding Randstad LLC from the Delaware Secretary of State, attached hereto as Exhibit "D".

> or other services that are the same as or substantially similar to the services you provided on behalf of Randstad within two (2) years prior to the date of your separation from Randstad.

This description is extraordinarily overbroad and covers a wide range of services that Plaintiff has not proven Ms. Robles was involved in providing while she was employed by Plaintiff. The Agreement describes "services" as things like "temporary, temporary to hire, direct hire and outsourced placement and staffing services." So, *any role* at any staffing company in any division that handled "temporary to hire" placements and staffing services would be prohibited.

*b. The restricted territory of the noncompete is ambiguous and overbroad.*

Next, Ms. Robles is left to parse through the four-part "Restricted Territory" definition. If she can't figure out what she can't do by reading the definition of Business of the Company, one would expect she could at least figure out where the restrictions don't apply. However, that is not the case.

Here, the "Restricted Territory" is defined in the Agreement as the territory encompassing four distinct and conflicting subparts to "*the maximum extent determined to be reasonable by a court of competition jurisdiction*", including:

> (i) a radius of twenty-five (25) miles of any office(s) to which [Ms. Robles] was assigned or which [Ms. Robles] managed, during the twelve (12) months prior to the date of [Ms. Robles'] separation of employment with Randstad;
> (ii) a radius of twenty-five (25) miles of any office(s) in which [Ms.

> Robles] performed services on behalf of Randstad at any time during the twelve (12) months prior to the date of [Ms. Robles'] separation of employment with Randstad;
> (iii) a radius of twenty-five (25) miles of any office(s) in which Randstad employed personnel whom [Ms. Robles] directly or indirectly supervised or managed during the twelve (12) months prior to the date of [Ms. Robles'] separation of employment with Randstad; and
> (iv) any region or territory to which [Ms. Robles] was actually assigned or which [Ms. Robles] managed during the twelve (12) months prior to the date of [Ms. Robles'] separation of employment with Randstad.

[Agreement, § 2(h) (emphasis added)]. It is unclear which territory applies. Plaintiff's intent with this language is unclear, but its effect is undeniable – the variable, subject to judicial interpretation, language is unenforceable and void due to its ambiguity.[12]

For example, the 25-mile radius, measured from Plaintiff's office in Phoenix covers virtually the entire Phoenix market. The restricted territory thus prohibits Ms. Robles from working anywhere in the Phoenix market despite the fact that approximately 80% of her work in 2020 was with Client A, in San Francisco, and the rest was with a handful of other companies that Plaintiff is so unconcerned with they are not even mentioned in the Motion. The restricted territory covers far more

[12] O.C.G.A. section 13-8-53(c)(1) provides that restrictive covenants must be construed to "cover only so much of such estimate as relates to the … geographic areas ***actually involved*** within a reasonable period of time prior to termination." (emphasis added). In addition, any ambiguities in the language of the agreements must be construed against Plaintiff as the drafter. *See Smith v. Persichetti*, 245 Ga. App. 357, 358, 537 S.E.2d 441, 443 (2000).

area than is necessary to protect Plaintiff's business interests and is over broad.

Further, if the noncompete applies within 25 miles from the office to which Ms. Robles was assigned, she is not violating the provision. Ms. Robles is exclusively working with Client X, located over 25 miles away from Plaintiff's Phoenix office. Plaintiff has failed to prove any legitimate business interest in preventing her from working from home and on placements and with companies outside the 25-mile radius.

Plaintiff's argument that a noncompete need not contain a geographic restriction under Georgia law is incorrect. Pursuant to O.C.G.A. section 13-8-53(a), a noncompete will be enforced only if it is reasonable in time, *geographic area*, and scope of prohibited activities. *See also* O.C.G.A. §§ 13-8-53(c)(2), 13-8-56(2). "Any restrictive covenant not in compliance with the provisions of [the Act] is unlawful and is void and unenforceable." O.C.G.A. § 13-8-53(d). The Act thus requires non-competition covenants to be reasonable in geographic area. O.C.G.A. § 13-8-53(a).

Plaintiff's reliance on *Novelis* is also misplaced. In *Novelis*, the court held the noncompete was enforceable despite a lack of geographical limitation because the noncompete "*included a list of particular competitors as Prohibited Businesses*, and restricted [the defendant] from working for them for a limited period of time, thus meeting subsection B of the standard [in O.C.G.A. § 13-8-56(2)(A)]." *Novelis Corp.*

*v. Smith*, No. 1:16-CV-1557-ODE, 2017 WL 1745635, at *7 (N.D. Ga. Mar. 10, 2017) (emphasis added). Moreover, *Novelis* involved a high-level executive. *Id*. at *2. Here, the Agreement does not contain any list of prohibited competitors and Ms. Robles was an Account Manager, not a high-level executive.

The restricted territory of the noncompete is over broad at best, ambiguous and wholly indecipherable at worst, and thus the noncompete is unenforceable.

**C. The injunction sought would disturb, not preserve, the status quo.**

Ms. Robles started at Beacon Hill on September 14, 2020. Therefore, the injunction sought will disturb, not maintain the status quo. Issuing the injunction would not restore the status quo. Approximately 80% of Ms. Robles work at Plaintiff in 2020 was with Client A. According to Plaintiff, Client A has already informed Plaintiff it was no longer working with Plaintiff. [TRO Brief, p. 8-9]. However, Ms. Robles is not doing business with Client A at Beacon Hill and has no intention of doing any. [Robles Dec., ¶ 24]. Issuing an injunction prohibiting Ms. Robles from working at Beacon Hill will not restore Client A's business to Plaintiff. As Plaintiff aptly states in its Motion for Remand, "[n]othing in Robles' Notice of Removal suggests or supports the idea that Client A's work will return to Randstad if this Court enjoins Robles. The damage has already been done with respect to Client A, and *the Court cannot un-ring the bell with an injunction*." [Doc. 4-1, p. 18].

## D. **<u>Plaintiff fails to demonstrate irreparable harm.</u>**

"[A] mere threatened monetary injury, which can be addressed in damages, is insufficient to establish the irreparable injury essential to the issuance of a [temporary restraining order]." *Diamond Power Int'l, Inc. v. Bergemann, Inc.*, 370 F. Supp. 2d 1339, 1349 (N.D. Ga. 2005) (citing *Corbin v. Corbin*, 429 F. Supp. 276, 282 (N.D. Ga. 1977)). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* at 1349 (citing *U.S. v. Jefferson Cty.*, 720 F.2d 1511, 1520 (11th Cir. 1983)); *see also Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1375 (N.D. Ga. 2001) (denying injunctive relief for alleged violations of non-solicit because Plaintiff had an adequate legal remedy).

"The availability of money damages affords [Plaintiff] an adequate and complete remedy, [and] preclud[es] the entry of injunctive relief." *Besser v. Rule*, 270 Ga. 474, 475, 510 S.E.2d 530, 532 (1999); *Murphy v. McMaster*, 285 Ga. 622, 623, 680 S.E.2d 848, 849 (2009) (denying an interlocutory injunction for the plaintiff's failure to show irreparable harm); *Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 735 F. Supp. 1537, 1543 (M.D. Ga. 1987) (holding that an employer failed to show irreparable injury, in part, because alleged injuries from former employee's employment with a competitor could be redressed with a monetary award).

Plaintiff has failed to carry its burden of showing it does not have an adequate remedy at law. While there is no evidence that Ms. Robles solicited Client A or any other clients, if Plaintiff ultimately claims any lost business as a result of Ms. Robles conduct, the revenues and profits lost are readily quantifiable. Any client Plaintiff claims left as a result of improper conduct by Ms. Robles generates easily quantifiable revenues and profits based on the commissions generated by job placements. Plaintiff cannot plausibly claim it lacks an adequate remedy at law.[13]

## E. <u>Enforcement of the restrictive covenants would harm the public interest.</u>

While there is certainly a public interest in upholding valid contracts that allow parties to protect their respective interests, Ms. Robles has done nothing to invalidate any alleged protected interest of Plaintiff. Ms. Robles has not used any alleged confidential information from Plaintiff. Issuing the injunction will severely restrict the public interest in favor of free competition and allowing employees to make a living for themselves and their families. Plaintiff is simply attempting to enjoin lawful, fair competition by preventing a former employee from continuing her career. The public interest strongly disfavors an injunction under these circumstances.

---

[13] Plaintiff also admits that this matter involves "Damages Arising out of Contract" in its Disclosure Statement to the Superior Court of Cobb County. See Exhibit "E".

## IV. CONCLUSION

For the reasons set forth herein, the Motion should be denied.

Respectfully submitted, this the 7th day of October, 2020.

BERMAN FINK VAN HORN P.C.

By: *<u>/s/ Benjamin I. Fink</u>*
Benjamin I. Fink
Georgia Bar No. 261090
Lea C. Dearing
Georgia Bar No. 922882
Ashley M. Bowcott
Georgia Bar No. 871190
3475 Piedmont Road, N.E.
Suite 1100
Atlanta, Georgia 30305
(404) 261-7711
bfink@bfvlaw.com
ldearing@bfvlaw.com
abowcott@bfvlaw.com

*Counsel for Defendant*

*1263402*

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULES 7.1D AND 5.1B**

Pursuant to Local Rules 7.1D and 5.1B, the undersigned counsel hereby certifies that the foregoing document complies with the Local Rules' requirements as to font in that it has been prepared in Times New Roman, 14 point.

This 7th day of October, 2020.

BERMAN FINK VAN HORN P.C.

By: */s/ Benjamin I. Fink*
Benjamin I. Fink
Georgia Bar No. 261090

*Counsel for Defendant*

3475 Piedmont Road, NE
Suite 1100
Atlanta, Georgia 30305
(404) 261-7711
(404) 233-1943 (Facsimile)

## CERTIFICATE OF SERVICE

I certify that, on October 7, 2020, I electronically filed the foregoing **DEFENDANT LISETTE ROBLES' RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER** with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Robert C. Stevens, Esq.
Alex Meier, Esq.
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3962
bstevens@seyfarth.com
ameier@seyfarth.com
***Counsel for Plaintiff***

BERMAN FINK VAN HORN P.C.

*/s/ Benjamin I. Fink*
Benjamin I. Fink
Georgia Bar No. 261090

*Counsel for Defendant*

3475 Piedmont Road, N.E., Suite 1100
Atlanta, Georgia 30305
(404) 261-7711
(404) 233-1943 (Fax)